Good morning, Mr. Aldrich. Good morning, Your Honors. May it please the Court, A. F. P. L. Aldrich on behalf of Mr. Jorge Molina-Gomez. Your Honors, the search and siege that my client, Mr. Molina, underwent on August 6, 2012, is the epitome of what an unreasonable search and seizure is. Now, I think everybody in this courtroom will agree that the government has afforded great leeway when searching and seizing things at the border, and there's historical, good, solid, logical reasons for that. Congress has allowed that as an exception of the Fourth Amendment. Courts have agreed historically, and the government, the executive has taken advantage of it. We're not contesting that it's a good, solid idea to have leeway for the government at the border. However, at the border, it's not a day off for the Constitution either, and the reasonableness requirement from the Fourth Amendment stands and is not defeated by the fact that it's a border search. In this case, in this particular case, I would submit to Your Honors that it is the epitome of an unreasonable search for the following reasons. My client was detained, Mr. Molina was detained. The government allegedly had suspicions, so they took him to an x-ray machine and x-rayed him. He volunteered to do this. This didn't allay the suspicions from the government, so they proceeded to, again, search him through a CT scan, albeit this was, he was shackled, he was taken shackled to a hospital. After the CT scan didn't turn anything up, and the original x-ray hadn't turned anything up, the next step was to monitor his bowel movements. You're not objecting to the reasonableness of any of that, are you? I didn't understand from your brief that you were contesting that. I thought you were saying only that because those came out negative, that cast doubt on the reasonableness of their suspicion to search the computer. Precisely. Okay, so that, whether that was something that should have happened or shouldn't have, you don't actually argue on appeal that it was unreasonable to do any of the searching that you're talking about so far, right? We are arguing, Your Honor, is that what I'm saying coupled with what happened with the property, all of it together- Only because it came out negative. Correct. Okay. Yes, the totality of the circumstances, including what you're saying, including the holding of the property for 22 days, all these things coupled together, the totality of the circumstances, lead to an inevitable conclusion that this was, in the totality of circumstances, an unreasonable search. Counselor, at what time in the sequence of events did the dog sniff of the computer turn out to be positive? I mean, that takes place in the same time frame. Well, he's in the hospital. That's when this takes place. Is that not correct? Yes, that's correct. Okay. Well, it doesn't, to the extent that, I gather it's your position that the government, that reasonable suspicion had to be established in order to carry out the search of the computer.  That's our position, Judge. Okay, so why doesn't that dog sniff contribute significantly to the reasonable suspicion? Our position is that reasonable suspicion was needed and was not attached and did not attach. However, even if there was reasonable suspicion, in our view, we would argue that this became, obviously, a non-routine search, which would lead to the reasonable suspicion needing to attach. But even if there was, even if reasonable suspicion was needed and did attach, we would argue that, again, as I said to the judge, all the things gathered together, all the property seizure and the search of his body coupled together make it unreasonable as a whole, in the totality of the circumstances. I don't know if that answered your question. Well, I assume in part you're going to focus on the duration, right? I mean, the actual search of the computer takes place quite some time out. It's in the 20 plus days. Twenty-two days. And he was detained, this person was detained for 18 hours, shackled to a desk, first of all, and then a hospital. So our contention is that all these things together lead to an unreasonable search and seizure. Because the government has ample leeway at the border does not mean that, as I said, the Constitution has a day off or that the government can do as it pleases. In the U.S. Department, the court said that it's not an anything-goes approach at the border. So even though they have ample leeway, it's not an anything-goes approach. I'd like to see if you can specify exactly what you think was unreasonable. Well, Judge, I believe that what was unreasonable was scanning the body of my client, not finding anything, going on to... Was that unreasonable? Why wasn't that unreasonable? Well, Judge, it's unreasonable when the government has suspicions. They do something to allay them, and they only grow more suspicious. But they had two suspicions. Yes, Your Honor, but they... One thought was that it was in one place. It turned out not to be there. But they also suspect maybe it's in the other place. When they ruled out one place, they focused on the second one. Why is that unreasonable? Particularly in the second one, when it had a sniffle. When they... Do you want me to go into the property or the person? Well, they seem to go together, don't they? Yes, they dovetail. Definitely they dovetail. I'll address the person first. They believed... This is the reason I believe it's unreasonable. They believed, first of all, that my client had external possession of drugs on his person. Then they allayed that suspicion, and they went on to believe that he had ingested illegal drugs. Then, after that was ruled out, they believed that he was trafficking narcotics on the property that had already been examined. And they were right. So they just... I mean, they found it there. Fine, Judge, but that's... But in other words... But they... One, here's the construction of what happened. We think it's in the computer. We can't find it in the computer. So maybe it's on the person. So we search the person. It's not on the person. Let's go back to the computer and keep looking. And then they find it there. What's unreasonable about that? Respectfully, Judge, Your Honor, if that logic were to attach to this case, then the initial reasonable suspicion that would come to life, that would be a sparlet letter that would last forever. If there was a reasonable suspicion at first, then the government tries to allay those suspicions, but it keeps going on. If I suspect from a certain person, and I try to allay the suspicions, and I'm not satisfied, it can go on forever, like it did in this case. It's 22 days for the property, 18 hours for the person, and even though I acknowledge, defense counsel acknowledges that the courts have not... Ramsey has said that it's never decided whether a board research might be deemed unreasonable because of the particularly offensive manner. I would submit to the court that the particular facts of this case and the You left out some facts to begin with. In three months, he'd been three times to Columbia, which, as we always say, is a source of drugs. Secondly, the answers he gives as to why he went there are ambiguous. That's what leads to the secondary search. I think those are important facts. Yes, Your Honor. They definitely are important facts, and we reiterate that even if the analysis were to be that reasonable suspicion did attach, even conceding that, which we're not, but even for argument purposes, if we were to concede that, the totality of the search was unreasonable. The totality of the search was unreasonable. Could you explain something in your brief that's frankly not very clear? You also seek suppression of statements that you say were obtained while he was in custody and being interrogated. Yes, Your Honor. I don't think you ever tell us what those statements are beyond saying that they to the search of the computer. Can you identify for us now what exactly the statements are that you're concerned about? I appreciate the question lets me pivot to that Fifth Amendment fact. Your Honor, I'll concede that there's a dearth in the record, and the reason for it is that the Honorable Judge Lestade did not grant a suppression hearing. Therefore, we don't have exactly We could not establish during the hearing what precise questions were asked by the government agents, what precise things did allegedly Mr. Molina say. You filed a motion to suppress, right? Yes, sir. And you were not in a position with the benefit of our client? You're not in a position to identify what those statements are? Yes, we were in the position to establish what our client had purportedly said, but we did not know in the second prong of the Fifth Amendment issue what precise questions would the agents testify as to what they had asked our client to establish whether they were, in fact, seeking to make incrementary statements, produce incrementary statements from my client. Are there any statements your client made that you would like suppressed that are relevant to the reasonable suspicion judgment, and what are they? All the statements that my client made on August 6, 2012, we would like suppressed. And the reason for that is that all the statements that he made, he made while shackled to a desk in the airport, and therefore was under custody. And the questions that were made tried to elicit incrementary behavior from my client, which they did. I'm sorry. So, just to clarify this one point, your position is any statement that the prosecution identifies as having been made during secondary inspection, if they identify that statement, your contention is that statement was made while he was shackled? Yes. And does your suppression motion say that? Your Honor, I believe the suppression motion, I cannot say with certainty at this point. But you're only entitled to suppress incriminatory statements, so we have to know what the statement is. Yes, Your Honor, what we're saying is that most of the statements that he made as to why he was in Colombia and what he was doing there, even though they're not incriminatory in the sense of saying, yes, I was trying to import drugs, they tend to make the case for the government in the sense of what Your Honor said at the beginning of the hearing. Well, he said that he was there for X reason or for Y reason, and that even though in and of itself is not incriminatory, they could lend the court to believe that something funny was going on. But he made, just so I, the statements that he made that you're objecting to are statements that would have shown reasonable suspicion. Is that right? Yes, and or incriminatory statements. Or incriminatory, were there any incriminatory statements? And could you identify what those are? Because those might be relevant to our analysis of whether you actually would have withdrawn the plea. The incriminatory statements, precisely, I cannot identify at this time. I would gladly read the matter and specify based on the suppression motion. Well, were they set forth in the suppression motion? Would the judge have known what statements it was you were concerned about when he made his ruling? Or did you just say suppress any statements without identifying them? I believe it was the latter, Judge. One final quick question. Some of the statements that you've identified and that you say contributed to the reasonable suspicion analysis, weren't some of those statements made before the secondary custody takes place? I mean, they have reasons to be suspicious of your client. And they ask some questions in light of that suspicion. And the answers to those questions then prompt the secondary custody. So isn't it true that some of those statements that contribute to reasonable suspicion were clearly made before he's in custody? Yes, Your Honor. You're right. I stand corrected. Some of the initial statements in my client's case were not made under custody. So I stand corrected. I apologize to the Court. But there's nowhere in the record where we could identify the statements that were made by your client in secondary inspection. Is that true or not true? Your Honor, with respect, I would have to double-check the suppression motion. I believe, as Your Honor pointed out, that it was a general suppression motion that did not identify specific statements. It was basically stating that all the things that my client had said, while checked with a desk, were, under the Fifth Amendment, had to be suppressed because they were in custody and he was being interrogated. Thank you. Thank you, Your Honor. Mr. Reyes. Your Honor, on behalf of the United States, I would like to speak briefly as to the statements that they're alleging should be suppressed. It was very difficult to respond to their brief because, as this Court noted, there aren't really allegations, specific allegations, as to what statements were made. And in the district court, actually, they denied all accusations. What they did was that they argued that the government had subjected the defendant to certain questions as to drugs from Colombia and that the defendant denied accusations. So, we didn't see from the motion as to there being an incriminatory statement that he was trying to suppress. What we did see is that in his appellate brief, he is mentioning also that the government asked him whether he was going to go to work the next morning after he arrived in Puerto Rico. So, that was the only actual question that we saw. So, that's the one we responded to. Just so I get, the government's position is if you had gone to trial, there was no statement that the defendant made during secondary inspection you would have wanted to use in the prosecution? We don't believe there was any statement made during that period that had not already been made that was under custody and deemed interrogation in the border search context that would not have been made prior. Because it's important to note that he arrived at around 10.50 at the airport and he was questioned immediately. And he was questioned until about 11.50 where he was transferred to the secondary inspection room for a pat-down. The pat-down took place at the secondary inspection room and then at 12.20 you see that the record shows that he signed a consent to go to the San Gerardo Hospital. So, apparently there was questioning there but my understanding is that by the time that the officers had decided to take him to the hospital most of the questioning had taken place. And that was at 12.20. The record is not clear as to when exactly he was handcuffed. The video does show that at 1.23 a.m. the defendant goes back to the secondary inspection baggage claim area at 1.23 a.m. and he is not shackled, he is not handcuffed. And the video shows that. At some point during this period from when he first got to the detention room to when he was taken to the San Gerardo Hospital he was handcuffed and shackled because that's procedure. The officers would not have taken him to the hospital if he's not handcuffed. So, at approximately around 1.49 a.m. the video shows him walking with an officer shackled on his way out of the airport to go to the San Gerardo Hospital where he was x-rayed. So, it's not clear exactly when he was handcuffed but our understanding is that there weren't any statements made incriminatory statements that he made after he was under custody that weren't already made prior to that. So, just so I understand that, if I heard you right just now you concede Miranda attached because he was in custody. No. Did you just say he was in custody? We believe he may have been in custody at some point after he left after he left to the airport when he was shackled going to the airport. So, while he was handcuffed in secondary inspection for whatever period of time between 11.50 and 12.20 is the government's position he was in custody or he wasn't? He was not. Even though he was handcuffed at that time? Even though we're not exactly sure. Well, for some period of time in secondary inspection as I heard you he was handcuffed. He was at some point. He was handcuffed to be taken to the San Gerardo Hospital. Well, only to leave or during the questioning period? Is there any way in the record? It's not clear from the record, Your Honor. But did you contest his account in the suppression motion that he was handcuffed during that secondary inspection? We concede that he was handcuffed. Yes, we concede that he was handcuffed but it's not clear from the record exactly when he was handcuffed. So, just whenever it was, let's say we came to a view of when it was. We do not concede that he was under custody. Even when he's handcuffed? Even when he's handcuffed. And could you explain why? Because just the fact that at 1.23 a.m. he's walking freely with no restraints on him, that belies the argument. I understand the period where he's not handcuffed, that he's not in custody. I'm asking about the period when he is handcuffed. Well, the cases don't say that just the fact that he's handcuffed or that he's taken to secondary inspection necessarily means custody in the border search context because in the border search, people are, travelers understand that they're going to be questioned, they're going to be detained. At this point, at the secondary inspection room, no contraband had been found. And Molina has to know that he's going to be subject to questioning. No contraband had been found. A criminal investigation was not under place. He was just being asked questions as to what are you going to do tomorrow after you leave here. We do not believe that's What is that setting like if a secondary inspection takes place? It's a small windowless room. It's a small windowless room. Apparently, it might have been. How many people were questioning him at that time? I believe it was at least two officers. This court saw a similar situation in Pratt. It's a 1981 case, I believe. And this court found that being placed in a windowless room with, I believe this court mentioned, two probing investigators was not sufficient to signal custody. But I think you indicated that at some point he was in custody. If I understood correctly, you do not, your position is that he was never in custody throughout? Our position is that he was not in custody, yes. In the context, as this court noted in Fernanda Ventura, the most significant feature here is that this incident took place in the context of a customs inspection. And he was taken to the hospital not because they had found any contraband. He was taken to the hospital because there were suspicions of contraband in his body. But no contraband had been found. No investigation had commenced. The questions were not. But in that context, in that case, we didn't say anything about whether he was free to leave or not, did we? We focused on whether the setting and the questioning were enough to trigger Miranda just in itself. The difference here, and this is why we're asking about it, at least why I'm asking about it, is that he was handcuffed. And whatever else you can say when you're handcuffed, I wouldn't say you're free to leave. In Fernanda Ventura, the district court made a similar argument, not an argument, but it found that not being free to leave suggested that he was under custody. And this court reversed the district court. And it found that the fact that he wasn't free to leave in the context of a customs inspection is not relevant. Not that it's not relevant, but it's not determinative. The fact that he's not free to leave is not determinative. What is determinative? It is the totality of the circumstances at hand. One cannot just focus on one particular. What would you focus on other than being free to leave? I would focus on when, for example, when contraband has been found and when the circumstances tend to change from merely determining whether Molina should be admitted into this country, which are questions that customs officers need to be able to ask at the border in order to do their jobs correctly. When it changes from that to furthering a criminal investigation, like we found the contraband, for example, and we bring in an investigator. If that were the case, that's a hypothetical, which is not this case. And now you're furthering a criminal investigation, trying to get incriminatory responses from the defendant. And that would be a different case, and it would be more akin to a custodial interrogation under Miranda that is, as I mentioned, analyzed differently in the customs inspection context. I wanted to touch briefly on the search. I wanted to make it clear that the fact that the defendant has two different issues as to the search of property, they really do not dovetail, as the defense would like to argue. It is different to search property than search a person. The Supreme Court so found in Florida Montano when a defendant in this case gives a rise to reasonable suspicion of contraband and the government does either routine or non-routine searches that dispel suspicions of contraband only as to his body, the defendant cannot profit from that and then argue, oh, the government cannot check my luggage. Holding to that effect would be tantamount to allowing the defendant to profit from being suspicious. He's suspicious, the government does some checks on his body, and now the government all of a sudden allows the authorities to do what would have otherwise been a valid non-suspicionless search of his property, which was only a search of the inner crevices. It wasn't a data extraction. It was a forensic examination of the data. This was tantamount to- Initially it was going to be a data extraction. That was the purpose that the computer was seeing. There was a mix-up in the paperwork, Your Honor. If you analyze this case carefully, you'll see that this is a drug contraband case. This is not a child pornography case where the authorities would be interested in the data. There was a mix-up in the paperwork and it said data extraction, and it's possible that they wanted to do both, but certainly the primary intent was to do a search for bags of heroin- I'm sorry, bags of contraband, of controlled substances. In fact, the record is unclear as to whether there was any data extraction done. Just so I understand the government's position. The government's position is that this search of the computer, which took place some 22 days after the defendant's arrival, it was still a routine search that did not require any degree of reasonable suspicion. Is that your position? Our position is that it did not. You're correct, Your Honor, but only I would add to that that it is somewhat inconsistent to call it routine because if one reads Florent Montano, the Supreme Court shied away from a balancing analysis to determine what is routine or non-routine in the context of searches of property. That analysis is proper when we're talking about an intrusive versus non-intrusive search of a person, but in the context of property, the balancing analysis to determine what is routine or non-routine is not as relevant. Are you saying that labeling has no relevance at all to the search of property when we're dealing with a border situation? Is that your position? Our position is that the analysis of routine versus non-routine that is more prevalent in the searches of a person is not an analysis. If you read Florent Montano, it's a 2004 case from the Supreme Court, and that case was a search of a vehicle's gas tank in which the government disassembled and reassembled to search a vehicle's gas tank and found drugs, which is analogous to this case. The government disassembled the computer and the PlayStation and carefully in what was, and it's important to note that similar to Florent Montano, this case is not a case of a destructive search. The government could have done a destructive search, but it actually wanted to play it safe and do a search, and that's part of the reason a non-destructive search by disassembling and reassembling, and that's part of the reason that the search took longer. And we submit that the government should be allowed to tailor their responses to the situation. And in this case, the search did take longer because it had to be taken to the La Puntilla laboratory, the customs laboratory in La Puntilla, and the agents tell me there's only one in Puerto Rico. Just on the reasonable suspicion, assuming that reasonable suspicion is required, apart from statements that Melina made, what is the government's view as to why there was reasonable suspicion? What evidence would you point to? Our argument is first that there's no reasonable suspicion was required, but getting past that, there were frequent unexplained short visits to Colombia. There were four, I'm sorry, three within a span of four months. There was one in May, another one in July, and this one, which was in August. All short, frequent visits. Also, the customs and border protection computer system referred Melina to a secondary inspection directly. That's another red flag. When there was also, as Your Honor mentioned, the inconsistent statement, he stated that he was Apart from statements, apart from any statements he made. Okay. One of those was very relevant, which was the I understand, but just apart from those, what do you have? Okay. Also, the computer contained no data. When officers booted up the computer at the airport, they found that it contained no data, and it was an old computer. It wasn't new, and it didn't have the files that you would expect a computer to accumulate throughout use. Also, there was a money gram, a Western Union money gram issued payable to Molina by a man named Rodolfo for one million Colombian pesos, which at the time was around $560. Also, there was evidence of money transactions, information of money transactions, where people sending Molina messages as to money transactions that were going to take place upon his arrival at New York, which was one of the inconsistencies that he stated he was going to work the next day, but he actually was going to travel. The trip was foiled because he was at the San Gerardo Hospital. Also, as Your Honor mentioned, the canine showed interest in his computer. These bags were expertly packaged, and it took a more significant effort from the government to be able to find it. So all of these factors, except perhaps for the dog sniff, apply both to the – there was actually a computer and a Game Boy device. A PlayStation, which is sort of a computer, but used to play video games. Right, but one packet of heroin was found in the computer, and the other was found in the Game Boy. Is that correct?  There was, I believe, one kilogram found in the PlayStation and half a kilogram of heroin found in the computer. So both the items had drugs, and the government searched them both and asserts, as I mentioned, that it was not destructive. It was a disassembly, reassembly, analogous to a flore montana. Your Honors, do you have any further questions? No, I think the time is up. Thank you, Your Honors.